**Todd FENER, on Behalf of Himself and All Others Similarly Situated, Plaintiffs,**

v.

**BELO CORP., et al., Defendants.**

Nos. Civ.A. 3:04–CV–1836–D, Civ.A. 3:04–CV–1869–D, Civ.A. 3:04–CV–2156–D.

United States District Court, N.D. Texas, Dallas Division.

March 30, 2006.

Robert E. Jenkins, Vial Hamilton Koch & Knox, Roger F. Claxton, Claxton & Hill,

Thomas E. Bilek, Hoeffner & Bilek, Dallas, TX, Willie Briscoe, Joe Kendall, Provost Umphrey Law Firm—Dallas, Andrea N. Salow, Benny C. Goodman, III, Erin P. McDaniel, Henry Rosen, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, San Diego, CA, for Plaintiffs.

Martin Burr McNamara, Gibson Dunn & Crutcher, Roger Evans, Mathis & Donheiser, Dallas, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

Defendants move to dismiss these consolidated securities fraud actions, contending, *inter alia*, that certain defendants did not make public statements, that plaintiffs impermissibly rely on group pleading, and that they have failed to plead a strong inference of scienter, as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. The court agrees that plaintiffs' complaint is defective in these respects, and it grants defendants' motions and allows plaintiffs to replead.

I

These consolidated cases constitute a putative securities fraud class action involving common stock of defendant Belo Corporation ("Belo"). The lawsuits are based on the reporting of circulation for *The Dallas Morning News* ("DMN") and of Belo financial results impacted by DMN's circulation figures and advertising revenue. The proposed class consists of all purchasers of Belo common stock between May 12, 2003 and August 6, 2004 (the "class period").[1] The lead plaintiff is Operating Engineers Construction Indus-

---

1. The court refers to this as the "class period," although no class has yet been certified. *See Nathenson v. Zonagen Inc.,* 267 F.3d 400, 404 (5th Cir.2001) (noting similarly that, "[d]espite the absence of certification, we will, for clarity's sake, refer to the time in question as the 'class period' ").

try and Miscellaneous Pension Fund. The defendants are Belo, five of its senior officers and directors—Robert W. Decherd ("Decherd"), Belo's Chairman, CEO since 1987, and President since 1994; James M. Moroney III ("Moroney"), DMN's publisher and CEO since 2001;[2] John L. (Jack) Sander ("Sander"), Belo's President/Media Operations since 2004;[3] Dunia A. Shive ("Shive"), Belo's Executive Vice President,[4] and Dennis A. Williamson ("Williamson"), Belo's Senior Corporate Vice President and CFO since 2004[5] (collectively, the "Belo Officers")—and Barry Peckham ("Peckham"), who was DMN's Executive Vice President in charge of circulation at DMN until he resigned on August 5, 2004.[6]

According to plaintiffs' first amended consolidated complaint ("complaint"), Belo is a media company that owns newspapers, television stations, cable news channels, and Internet websites. Belo's flagship subsidiary is DMN, a daily newspaper responsible for over 60% of Belo's overall newspaper revenue and more than 30% of Belo's total revenue. Between 2000 and 2003, DMN revenue declined a total of $100 million, putting tremendous pressure on defendants[7] because Belo was heavily burdened with debt that exceeded $1.2 billion. When Belo announced in early August 2004 that certain "questionable circulation practices" at DMN had resulted in overstating its circulation, Belo's stock price fell, and the first two of these lawsuits were filed within the month.

Plaintiffs allege as their first claim that defendants are liable for violating § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. They assert as their second claim that the individual defendants are liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons of Belo.

Plaintiffs allege that DMN derives 90% of its revenue from advertising and 10% from paid circulation. Many print advertising contracts, including those at issue in this case, contain circulation-based incentives; the greater the reported circulation, the more advertisers pay to place advertisements. Beginning as early as 1999,[8]

2. Plaintiffs allege that Moroney joined Belo in 1978 and served at various times as President of Belo Interactive, Inc., Executive Vice President of Belo, President of the Television Group, and Executive Vice President of the Television Group.

3. Plaintiffs allege that Sander joined Belo in 1997 and served before as Executive Vice President of Media Operations, President of the Television Group, and Executive Vice President of the Television Group.

4. Plaintiffs allege that Shive joined Belo in 1993 and served before as Executive Vice President of Media Operations, Executive Vice President/Chief Financial Officer, Senior Vice President/Chief Financial Officer, Senior Vice President of Corporate Operations, and Vice President of Finance.

5. Plaintiffs allege that Williamson joined Belo in 1997 in conjunction with its acquisition of the Providence Journal Company and served

before as Senior Corporate Vice President and as Senior Vice President of the Television Group.

6. Plaintiffs allege that Peckham had held senior circulation positions at DMN and had served previously as DMN's Controller.

7. In this opinion, when the court refers to allegations that plaintiffs make against "defendants," it means that the assertion is made about defendants collectively, without naming them individually or differentiating among them. As the court later explains, this is a major shortcoming in the complaint.

8. In ¶ 2 of their complaint, plaintiffs allege that the scheme began "as early as 1999." In ¶ 6 they aver that the scheme started "in about 2000."

defendants engaged in a scheme to defraud DMN advertisers and Belo investors by intentionally overstating DMN's circulation for the purpose of increasing advertising revenue. They regularly reported DMN's fraudulently overstated circulation numbers and Belo's artificially inflated financial results to investors and the market. The scheme resulted in Belo's improperly recognizing revenue and artificially inflating the value of Belo stock, thereby defrauding investors as well.

Plaintiffs aver that defendants committed securities fraud by making false statements or failing to disclose adverse facts that each defendant knew about Belo, thereby deceiving investors concerning Belo's prospects and business, artificially inflating the price of Belo common stock, and causing plaintiffs and other class members to purchase Belo common stock at inflated prices. In various SEC filings, press releases, conference calls, industry conference presentations, and analyst reports,[9] defendants reported false and misleading DMN circulation figures, Belo operating revenues and earnings (or provided false and misleading earnings guidance), and reasons for changing circulation calculation methodology, knowing that Belo had improperly recognized unearned advertising revenues based on overstated circulation figures that resulted in overcharges to advertisers. They also knew that Belo had reported materially and artificially inflated results that did not conform with Generally Accepted Accounting Principles ("GAAP") and SEC rules. Furthermore, defendants knew that Belo lacked adequate internal controls capable of reporting accurate circulation data for DMN, had failed to reserve for the clearly foreseeable and estimable costs of providing advertising fee credits to DMN advertisers, had failed to reserve for the estimable administrative, legal, investigative, and public relations costs necessary to provide compensation to its advertisers and defend Belo against likely regulatory and legal scrutiny, had failed to disclose known adverse trends or conditions, and had committed other violations of GAAP.

Belo and the Belo Officers move to dismiss under Fed.R.Civ.P. 12(b)(6) and 9(b), contending, *inter alia*, that plaintiffs have failed adequately to plead scienter. Peck-

**9.** Plaintiffs complain about the following: an SEC Form 10–Q, dated May 12, 2003; a May 20, 2003 press release; a June 19, 2003 press release; two July 25, 2003 press releases; an SEC Form 10–Q, dated August 11, 2003; an August 20, 2003 press release; a September 15, 2003 press release; a September 16, 2003 article; a September 17, 2003 article; two October 22, 2003 press releases; an earnings conference call to discuss 3Q 2003 results (in which defendants Decherd and Shive participated); an October 29, 2003 article; an SEC Form 10–Q, dated November 10, 2003; a November 19, 2003 press release; a December 18, 2003 press release; two February 6, 2004 press releases filed with SEC Form 8–K; a February 6, 2004 conference call with financial analysts; two February 6, 2004 analyst reports; a February 7, 2004 article; a February 18, 2004 press release; an SEC Form 10–K, dated March 4, 2004; the March 9, 2004 Bear Stearns 17th Annual Media, Entertainment and Information Conference; a March 23, 2004 press release; an April 21, 2004 press release filed with SEC Form 8–K; an April 21, 2004 conference call with analysts; an April 21, 2004 analyst report; an April 22, 2004 article; an April 22, 2004 analyst report; an SEC Form 10–Q, dated May 6, 2004; a May 12, 2004 article; a May 19, 2004 press release; a May 19, 2004 analyst report; a May 20, 2004 analyst report; a May 24, 2004 article; a June 17, 2004 press release; a presentation at the Mid–Year Media Review Conference; a July 23, 2004 press release; and a July 23, 2004 article. Some documents in this list are articles that contain statements that plaintiffs allege were made by defendants and repeated to the market as opposed to documents prepared by Belo. *See, e.g.,* Compl. ¶¶ 70–71.

ham has filed a separate motion in which he seeks dismissal on this and other similar grounds. Plaintiffs have filed a consolidated opposition brief to both motions, and defendants have filed a joint reply brief.[10]

## II

▉ "In order to state a claim under section 10(b) of the [Exchange] Act and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury.'" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406–07 (5th Cir.2001) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994)). "Scienter—a mental state embracing intent to deceive, manipulate, or defraud—is an essential element of a securities fraud claim under § 10(b) of the Exchange Act and Rule 10b–5. Section 10(b) proscribes knowing or intentional conduct." *Coates v. Heartland Wireless Commnc'ns, Inc.*, 100 F.Supp.2d 417, 421 (N.D.Tex.2000) (Fitzwater, J.) (*"Coates III"*) (citations and footnote omitted).

▉ "[T]o survive a motion to dismiss a securities-fraud action, plaintiffs must, *inter alia*, plead specific facts establishing a strong inference of scienter." *Fin. Acquisition Partners L.P. v. Blackwell*, 440 F.3d 278, 287 (5th Cir.2006) (citing *Nathenson*, 267 F.3d at 407). "The PSLRA pleading standard for scienter is especially challenging for plaintiffs." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696–97 (5th Cir. 2005). "For PSLRA purposes, plaintiffs

may establish scienter by demonstrating either intent or severe recklessness." *Fin. Acquisition Partners*, 440 F.3d at 287 (emphasis omitted); *see Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 365 (5th Cir.2004) ("[T]he PSLRA state of mind requirement is severe recklessness or actual knowledge.").

> A plaintiff can plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater. Conscious behavior is a more stringent standard. Conscious behavior, of course, means conscious *mis*behavior. To allege scienter based on conscious conduct, a plaintiff must plead strong circumstantial evidence of misbehavior.

*Mortensen v. AmeriCredit Corp.*, 123 F.Supp.2d 1018, 1025 (N.D.Tex.) (Fitzwater, J.) (citations, internal quotation marks, and brackets omitted), *aff'd*, 240 F.3d 1073 (5th Cir.2000) (per curiam).

▉ Severe recklessness is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Nathenson*, 267 F.3d at 408 (internal quotation marks omitted) (quoting *Broad v.*

---

**10.** All defendants filed on August 1, 2005 a request that the court take judicial notice of certain SEC filings, press releases, conference call transcripts, and other materials. Plaintiffs filed on October 3, 2005 a motion to strike certain documents that defendants have submitted and hearsay statements derived from the documents, or to convert defendants' motions to summary judgment motions and allow reasonable discovery. Considering the basis on which the court has decided defendants' motions to dismiss, it has not relied on the documents that are the subject of the judicial notice request or the motion to strike. Accordingly, the request to take judicial notice and the motion to strike are denied as moot.

*Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir. Apr.1981) (en banc)).

■ "Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter," *id.* at 412, but "allegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA," *Goldstein v. MCI WorldCom,* 340 F.3d 238, 246 (5th Cir.2003) (citing *Nathenson,* 267 F.3d at 412).

■ "Circumstantial evidence can support a scienter inference." *Fin. Acquisition Partners,* 440 F.3d at 287 (citing *Nathenson,* 267 F.3d at 408). The court "consider[s] all the facts and circumstances alleged to determine whether they, in toto, raise a requisite strong inference of scienter." *Goldstein,* 340 F.3d at 246 (citing *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 430 (5th Cir.2002); *Nathenson,* 267 F.3d at 410). It "consider[s] any evidence of scienter pleaded by the plaintiffs cumulatively." *Id.* at 247.

■ "The PSLRA ... requires that the complaint 'with respect to *each* act or omission alleged' to be false or misleading 'state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind.'" *Southland,* 365 F.3d at 363 (quoting 15 U.S.C. § 78u–4(b)(2)). Concerning the liability of the individual defendants, "[u]nder the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a corporate defendant. Plaintiffs must also particularize intent allegations raising a 'strong inference of scienter.'" *Goldstein,* 340 F.3d at 249 (addressing liability of corporation's Chief Executive Officer and Chief Financial Officer/Executive Vice President). Regarding Belo's liability under § 10(b) of the Exchange Act and Rule 10b–5 as a corporate defendant,

[f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment. This is consistent with the general common law rule that where, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency.

*Southland,* 365 F.3d at 366 (citations and footnotes omitted).

■ "[G]roup pleading ... is *not* permitted for PSLRA actions in our circuit." *Fin. Acquisition Partners,* 440 F.3d at 285; *see Coates v. Heartland Wireless Commnc'ns, Inc.,* 26 F.Supp.2d 910, 915–17 (N.D.Tex.1998) (Fitzwater, J.) ("*Coates I*") (rejecting group pleading after enactment of PSLRA). Accordingly, concerning the individual defendants,

[f]or the claimed fraud, Plaintiffs must distinguish among defendants and allege the role of each. Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded. Corporate statements can be tied to officers if plaintiffs allege they signed the documents on which the statements were made or allege adequately their involvement in creating the documents.

*Fin. Acquisition Partners,* 440 F.3d at 287 (citation omitted).

In deciding defendants' motions to dismiss, the court "accept[s] the facts alleged in the plaintiffs' complaint as true and constru[es] their allegations in the light most favorable to them." *Goldstein,* 340 F.3d at 244 (citing *Abrams,* 292 F.3d at 430). The court does not, however, " 'strain to find inferences favorable to the plaintiff[s].' " *Id.* (quoting *Westfall v. Miller,* 77 F.3d 868, 870 (5th Cir.1996) (alteration in original)). "Nor [does the court] accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland,* 365 F.3d at 361 (citing *Nathenson,* 267 F.3d at 406). Additionally, concerning the issue of scienter, "[w]hile under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable. . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences." *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 645 (5th Cir.2005) (internal quotation marks omitted).

 "[P]ursuant to the PSLRA, failure to adequately plead scienter requires dismissal of the complaint." *Fin. Acquisition Partners,* 440 F.3d at 287 (citing 15 U.S.C. § 78u–4(b)(3)(A)).

### III

Defendants maintain that plaintiffs' complaint relies improperly on group pleading.[11] Although they advance this argument in support of a broad challenge to the complaint, the court will initially focus more narrowly on whether the allegations against Moroney, Peckham, and Sander

falter on this basis. The Belo Officers move to dismiss the actions against these three defendants on the ground that the complaint does not allege that they ever made a public statement, fraudulent or otherwise. Peckham also moves to dismiss on this basis, asserting that he made no statements to the investing public, directly or indirectly, and had no contact with analysts, the financial press, or the investing public. Because the court agrees with defendants, it will dismiss the actions against Moroney, Peckham, and Sander on this ground.

As the court has noted above, under the PSLRA plaintiffs must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland,* 365 F.3d at 365 (internal quotation marks omitted). Therefore, even if in a non-PSLRA case an assertion regarding "defendants" collectively might be viewed deferentially to mean *all* the defendants in the case, in a PSLRA action an allegation made against the "defendants" will normally have the effect of naming *no* defendant at all, because the assertion will not enlighten each defendant as to the person's particular part in the alleged fraud. *See id.* ("Consistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded."). Instead, plaintiffs must tie each defendant to materials alleged to be fraudulent by pleading that the defendant signed the document or made the statements or

---

11. Peckham does not include a heading in his brief, as do the other defendants in their brief, that asserts that plaintiffs rely improperly on group pleading. But he clearly argues this ground for dismissal. *See* Peckham Br. 10 ("Plaintiffs rely extensively, and essentially, on group pleading and seek to pull Peckham into their line of fire by doing so."); *id.* at 10–11 (citing examples of group pleading and arguing that "group pleading allegations are legally insufficient").

by adequately alleging his involvement in creating the document or making the statement. *See Fin. Acquisition Partners*, 440 F.3d at 287.

Plaintiffs assert that defendants committed securities fraud through misrepresentations in various SEC filings, press releases, conference calls, industry conference presentations, and analyst reports. Of the six individual defendants sued, plaintiffs do not explicitly identify Moroney, Peckham, or Sander as having signed any document or orally made any of the misrepresentations or omissions that are the basis for their claim under § 10(b) of the Exchange Act and Rule 10b–5. Reviewing the complaint in its entirety, it appears that plaintiffs seek to hold these three defendants (among the other individual defendants) liable based on their positions with Belo. In ¶ 55 plaintiffs allege that "[t]he Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Belo's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market." Compl. ¶ 55. They aver that "[e]ach defendant was provided with copies of the press releases, alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected." *Id.*

▮ But the positions these defendants held with Belo cannot alone serve as a basis to hold them responsible for the contents of the materials alleged to be fraudulent. *See R2 Invs.*, 401 F.3d at 646 ("We will not, however, attribute knowledge of the document's contents based solely on the positions of the defendants."); *see also Fin. Acquisition Partners*, 440 F.3d at 287 ("Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the

corporation is pleaded."); *Nathenson*, 267 F.3d at 424 ("We recognize that normally an officer's position with a company does not suffice to create an inference of scienter."). While plaintiffs correctly point out that there can be "special circumstances" that, together with an officer's position, support a different result, Ps. Br. 29 n. 12, plaintiffs have not alleged them with sufficient specificity as to these three defendants. Accordingly, the court dismisses plaintiffs' claim against these defendants under § 10(b) of the Exchange Act and Rule 10b–5 on the basis that they have failed adequately to connect them to the content of at least one of the SEC filings, press releases, conference calls, industry conference presentations, or analyst reports in question.

Although the group pleading deficiency does not apply to Belo directly, it does result in the dismissal of the § 10(b)/Rule 10b–5 claim against it arising from the conduct of Moroney, Peckham, or Sander based on the failure adequately to plead scienter. Under *Southland* to determine whether a statement made by Belo was made with scienter, the court looks to the state of mind of the individual corporate official or officials who made or issued the statement, or ordered or approved it or its making or issuance, or who furnished information or language for inclusion therein, or the like. *Southland*, 365 F.3d at 366. "[T]he required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation...." *Id.* Here, because plaintiffs have failed to connect Moroney, Peckham, or Sander to an oral or written misrepresentation or omission, they cannot establish scienter against Belo based on their conduct.

### IV

The court now turns to the question whether plaintiffs have adequately pleaded scienter.

Defendants maintain that plaintiffs assert only general, conclusory allegations concerning the individual defendants. They contend that plaintiffs have not properly alleged conscious behavior or severe recklessness by any defendant because bare allegations that defendants knew about the circulation overstatement are insufficient to plead scienter, plaintiffs' unsupported allegations regarding the DMN Circulation Department do not establish scienter, misrepresenting Belo's announcements following the discovery of the circulation overstatement does not constitute evidence of scienter, and plaintiffs have not alleged facts giving rise to a strong inference of defendants' scienter based on GAAP violations. Defendants posit that plaintiffs have not alleged motive or opportunity that would give rise to a strong inference of scienter. They note that motive and opportunity allegations alone do not demonstrate scienter; they contend that, because plaintiffs have failed to plead sufficient allegations of scienter, their motive and opportunity allegations are irrelevant; and they assert that plaintiffs' effort to plead motive fails. Defendants reason that plaintiffs' attempt to plead motive lacks merit because universally held motives do not give rise to any inference of scienter; plaintiffs' allegations concerning pep talks and layoffs are irrelevant; and there is no evidence of insider trading to support plaintiffs' deficient scienter allegations.

Plaintiffs respond that they have adequately alleged a strong inference of scienter. They posit generally that their complaint does not suffer from conclusory allegations and that the court must analyze the allegations of the complaint as a whole, considering whether all the facts and circumstances taken together are sufficient to support the necessary strong inference of scienter. Plaintiffs argue that the complaint provides ample, specific details about defendants' actual knowledge of a circulation overstatement scheme at DMN that began in 2000 and events in 2002–03 that demonstrate defendants' actual knowledge of their false statements. They rely on the complaint's allegations concerning *"The Morning News* Game" and the scheme to enforce it, that defendants were aware of internal corporate information by at least January 2003 that contradicted their class period statements, Belo's numerous and repeated accounting violations, defendants' post-class period admissions that identify their false class period statements, and defendants' management bonuses and defendant Decherd's stock sales.

## V

### A

Plaintiffs contend that the complaint's allegations concerning *"The Morning News* Game" support a strong inference of scienter. They argue that defendants actually knew that DMN's circulation was inflated because they developed a scheme to manipulate the circulation so as to inflate Belo's financial results. According to plaintiffs, the plan, developed in 2000, was called *"The Morning News* Game," and was a complex scheme designed to create a system that put immense pressure on DMN employees to "back into" circulation numbers of previous years. They allege that defendants used several methods to achieve the goal of forcing circulation employees to play *"The Morning News* Game" or lose their jobs: they set unrealistically high distributor draws [12] and refused to allow draw reductions; told State Regional Managers, State Zone Managers, and distributors the circulation figures that had to be achieved on audit work

12. A distributor's "draw" is the number of newspapers he purchases. *See* Compl. ¶ 11.

sheets; required distributors to report a very low number of papers left unsold in their racks and required distributors to go on midnight recoveries to collect excess papers from the racks; required employees to manipulate college drops and home delivery subscription service starts and stops; and threatened to terminate distributors who refused to play the game. Plaintiffs assert that defendants also created other incentives for DMN employees, such as paying bonuses for meeting circulation goals and offering free vacations for winning circulation contests.

Plaintiffs contend that to force DMN employees to participate in their scheme, they had to make it clear that everyone would participate in the game or risk losing his job. They cite as an example that defendants Decherd, Moroney, and Peckham regularly gave "pep talks" to all DMN executives, managers, employees, and distributors, in which they explained why it was imperative to achieve the previous year's circulation. They followed the "pep talks" with thinly-veiled threats of termination and unemployment if DMN employees did not play along. In support of this assertion, they cite an October 26, 2001 email that defendant Moroney sent to all DMN employees, in which he emphasized that 73 DMN colleagues had lost their jobs the previous day and stated that employees had a daily obligation to increase circulation; a November 7, 2001 employee letter from defendant Decherd regarding a reduction in force that affected 160 individuals, in which he noted that meeting "expected revenue levels has required sacrifice and understanding by everyone"; and the requirement that DMN distributors sign a Publishers Statement Period form that confirmed that they had received notice of the numbers they were required to meet during that audit period and noting that "[f]ailure to meet these goals will result in a review of your contract."

Plaintiffs also rely on allegations that defendants supported their scheme by creating a top-down bureaucratic system that forced each link in the chain of command to fill out documents—including Home Delivery Weekly Performance Reports and State Objective Recap Reports—that reported circulation numbers and start/stop information to upper circulation managers. State Zone Managers were required to create a "90 Day Action Plan" for review by their superiors. State Zone Managers were required to explain how they would improve the performance of their zones to meet the previous year's circulation numbers by marking choices such as terminating the contracts of distributors who did not meet their year-over-year numbers and play *"The Morning News* game." They cite as an example a January 2003 voicemail left by a State Regional Manager to a distributor in which he stated, "wait a minute, this is not our goal, this is where it's going to come in, 1.2 Sunday, 1.3 daily." Plaintiffs aver that this left a clear message from upper management that distributors were to do whatever was necessary to report circulation numbers equal to or greater than the prior year's.

Finally, plaintiffs argue that the complaint pleads that defendants enforced their scheme by discouraging distributors from allowing service stops and creating "start plans" designed to increase circulation at any cost. They posit that State Zone Managers used the plans to push distributors into increasing new subscriber starts despite the fact that defendants knew that many starts were actually "bad starts" in which the subscriber declined service and was billed anyway. Plaintiffs cite an August 5, 2004 statement by defendant Decherd that DMN was making procedural changes necessary to ensure the collection and reporting of more accurate circulation data, which plaintiffs say is an admission that the "documentary cover"

that defendants created to support their scheme could not provide accurate circulation data.

## B

Plaintiffs appear to be relying on a theory of conscious misbehavior rather than severe recklessness. *See* Ps. Br. 30 ("Defendants actually knew that the *DMN*'s circulation was inflated because they developed a scheme to deliberately manipulate the circulation at their flagship newspaper in order to artificially inflate Belo's financial results.").[13] The premise of these allegations is that defendants developed a scheme to inflate DMN's circulation and then lied about it in SEC filings, press releases, conference calls, industry conference presentations, and analyst reports.

## 1

■■■■ As a threshold matter, the court observes that many of plaintiffs' allegations founder because they are not specific as to the defendant in question and they rely on an impermissible form of group pleading.[14] In a case governed by the PSLRA, plaintiffs "must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant." *R2 Invs.*, 401 F.3d at 643 (citing *Southland*, 365 F.3d at 365). Yet virtually all—if not all—of plaintiffs' allegations concerning defendants' scienter based on *"The Morning News* Game" are addressed to "defendants" collectively. *See* Compl. ¶ 37 ("In fact, The Morning News game continued to be played for another year and a half, until defendants

---

**13.** Although plaintiffs allege in the complaint that the individual defendants acted recklessly, *see* Compl. ¶¶ 159, 170, 176, and 177, they do not explicitly appear to allege scienter based on severe recklessness with respect to *"The Morning News* game." Plaintiffs allege in ¶ 176 that Decherd, Shive, Williamson, Sander, and Moroney knew or recklessly disregarded that Belo's publicly reported circulation figures for DMN were false and misleading; that Belo was incapable of accurately calculating, reporting, and recording circulation figures for DMN; that defendants' scheme to fraudulently overstate circulation figures for DMN by fraudulently overcharging advertisers would have a direct impact on Belo's revenues; and that Belo was not entitled to many millions of dollars of revenue that was generated as a direct result of the fraudulently overstated circulation figures for DMN. They make similar allegations about Peckham in ¶ 177. They do not allege facts, however, that purport to establish that any defendant acted with severe recklessness, that is, that the defendant participated in highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that presented a danger of misleading buyers or sellers that was either known to the defendant or so obvious that the defendant must have been aware of

it. And plaintiffs cannot rely in any event on rote and conclusory allegations that a defendant acted recklessly. *See Melder v. Morris*, 27 F.3d 1097, 1103–04 (5th Cir.1994).

**14.** In its traditional meaning, the term "group pleading" refers to a doctrine that "allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Southland*, 365 F.3d at 363 (internal quotation marks omitted) (quoting *In Re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999)). In its original sense it is conceptually related to the first element of a securities fraud claim—whether the defendant made a misstatement or an omission—not to the third element—whether the defendant acted with scienter. *See id.* ("Therefore, the "group pleading" doctrine as so applied would allow the plaintiff to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud."). Nevertheless, the term "group pleading" is useful in describing the practice of improperly attempting to attribute scienter to a group of persons without enlightening each defendant as to the person's particular part in the alleged fraud.

were forced to admit in August 2004 that The Dallas Morning News circulation was falsely overstated."); ¶ 58 ("Defendants knew that Belo had recognized unearned revenue because The Morning News game to overstate circulation figures operated to improperly overcharge advertisers for ads and inserts, which resulted in Belo recognizing unearned advertising revenue."); ¶ 65 ("Defendants knew that The Morning News game to overstate circulation figures operated to improperly overcharge advertisers for ads and inserts, which resulted in artificially inflated revenues at the Company."); ¶ 80 ("Defendants knew that the Company had recognized unearned revenue because The Morning News game to overstate circulation figures operated to improperly overcharge advertisers for ads and inserts, which resulted in artificially inflated revenues at the Company."); ¶ 106 ("Defendants knew that the Company had recognized unearned revenue because The Morning News game to overstate circulation figures operated to improperly overcharge advertisers for ads and inserts, which resulted in artificially inflated revenues at the Company."); ¶ 126 ("Defendants knew that revenues were not properly recognized because The Morning News game to overstate circulation figures operated to improperly overcharge advertisers for ads and inserts, which resulted in artificially inflated revenues at the Company."); ¶ 179 ("Moreover, the Individual Defendants not only knew about the scheme to overstate circulation at The Dallas Morning News, but they played a vital role in the scheme by encouraging participation in The Morning News game with "pep talks" disseminated by defendants Decherd, Moroney and Peckham in emails, letters and during meetings to all executives, managers, employees and distributors of The Dallas Morning News."). These allegations are plainly inadequate to plead a strong inference that any particular defendant acted with scienter.

Moreover, the allegations concerning defendants' participation in the scheme are also in many instances addressed to "defendants" collectively. The complaint describes the scheme in ¶¶ 6–29. In these paragraphs, only defendants Decherd and Moroney are mentioned by name, and then only in ¶ 10; otherwise, plaintiffs address their allegations to "defendants" as an undifferentiated unit. *See id.* at ¶ 6 ("Defendants embarked on a scheme to improperly recognize advertising revenue by overcharging their advertisers to place ads and inserts in daily and Sunday publications of The Dallas Morning News."); ¶ 7 ("Defendants carried out this scheme by utilizing various improper devices to back into the prior year's numbers and artificially inflate circulation figures at The Dallas Morning News."); *id.* at ¶¶ 7–8, 10, 11, 13 (alleging conduct that "Defendants" undertook); ¶ 19 ("Another device defendants employed in furtherance of their scheme to fraudulently inflate circulation figures at The Dallas Morning News was to falsely overstate home delivery subscriptions."). Similarly, these allegations are insufficient.

2

Regarding the allegations that *do* identify a specific defendant or defendants by name, it is necessary to separate the assertions that can serve as a basis for a claim of conscious misbehavior from those that appear to be nothing more than hyperbole or rhetoric. In other words, it is essential to gain an understanding from the complaint—unadorned by the embellishment and characterizations that a lawyer's pen can add through use of intensifiers, adjectives, and adverbs—of what plaintiffs say the scheme actually was and how a given defendant played a part in it.

In a case that rests on an intentional plan to report artificially inflated circulation figures, it is necessary to separate

permissible conduct aimed at boosting circulation from wrongful acts or omissions intended to falsify it. An ineluctable premise of plaintiffs' suit is that higher circulation numbers are better for a publication that charges for advertising based on circulation and that derives the vast majority of its revenue from advertising. This is unremarkable. Most, if not all, forms of media that accept advertising attempt to make a profit this way. It is not improper for such a business to undertake accepted business practices aimed at increasing circulation. Nor for the purpose of boosting circulation is it wrong for management to direct, persuade, or create incentives for those whose work they manage. What is wrong is to manipulate figures, fabricate numbers, or misrepresent the publication's actual circulation. The question then is whether plaintiffs have pleaded sufficient facts to place a specific defendant in the category that demonstrates improper conduct and thus creates a strong inference of scienter.

In ¶ 10 plaintiffs allege that defendants engaged in "scare tactics" to make clear to the entire State Circulation Department, and especially to distributors, that their willingness to play *"The Morning News* game" was not optional, and that those who refused to play did so under the direct threat of losing their livelihood. They assert that, in late 2001, Moroney and Decherd sent repeated messages to everyone at DMN concerning the termination of large groups of employees and the "daily obligation" of the remaining employees to do whatever was necessary to increase circulation at DMN. When these allegations are read together with other parts of the complaint, they are insufficient to place Moroney and Decherd within the rubric of those engaged in improper conduct aimed at falsifying circulation figures.

In ¶ 179 of the complaint, plaintiffs assert that Decherd, Moroney, and Peckham played a vital role in the scheme by encouraging participation in *"The Morning News* game" with "pep talks" disseminated in emails, letters, and during meetings to all DMN executives, managers, employees, and distributors. The "pep talks" generally stressed the importance of increasing circulation figures at DMN in order to increase Belo's advertising revenue, and discussed how and why this would happen in the next year. On October 10, 12, and 16, 2001 Moroney distributed emails to everyone at DMN regarding meetings in which they could talk with him personally to address issues that had arisen from a letter that Decherd had sent to them on October 10, 2001. Decherd often sent "pep talks" to DMN and Belo employees. On November 7, 2001 Decherd sent another letter to all Belo employees updating them on the "good progress Belo is making," while at the same time admitting that the period at the end of the year "is crucial from a business standpoint in any year, but especially so in 2001." *Id.* He stated that revenues continued to improve gradually throughout the company, but that "fourth quarter comparisons to 2000 are difficult due to the absence of political revenues." *Id.* He stressed that, "[c]ontinuing to have outstanding revenue performance relative to Belo's peer companies is the single most important business result that positively impacts shareholder value," and that, "[e]ach of you is a contributor to Belo's success." *Id.* On April 10, 2002 Moroney held the DMN Vision Contractor Meeting, the first time that the Publisher/CEO had ever addressed the entire distributor force.

In ¶ 180 plaintiffs aver that Moroney engaged in blatant "scare tactics" on October 26, 2001 when he sent an email to everyone at DMN that repeatedly mentioned that 73 DMN colleagues (many of whom had worked in the State Circulation Department) had lost their jobs the previous day, stressed that each remaining em-

ployee had a "daily obligation" to increase circulation, and emphasized that DMN had "not printed the most newspapers [DMN] will ever print. . . . Those days are ahead of us all." *Id.* They assert that Decherd personally sent a November 7, 2001 letter regarding an October 29, 2001 reduction in force that affected 160 individuals, noting that meeting "expected revenue levels has required sacrifice and understanding by everyone." *Id.*

When ¶¶ 10, 179, and 180 are read together, it is clear that plaintiffs are accusing Moroney and Decherd of nothing more than techniques that shareholders—including, presumably, the plaintiff-shareholders—would expect management of a publicly-held company to undertake: stress among employees the importance of increasing circulation to bolster revenues; inform them that revenue positively impacts shareholder value; make each employee understand that person's individual role in contributing to the company's success; remind them of the consequences (employee layoffs) of not increasing circulation; and emphasize each employee's individual, daily obligation to increase circulation. These allegations do not create a strong inference of scienter. *See, e.g., In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F.Supp.2d 832, 858 (N.D.Tex.2005) (Cummings, J.) (holding that "setting of aggressive targets by management" and "desirability of subscriber growth" not bases for scienter).

In the paragraphs of their complaint that plaintiffs cite in their brief to show that they have adequately pleaded a strong inference of scienter based on the *"The Morning News* game," *see* Ps. Br.

30–33 (citing Compl. ¶¶ 3, 6–29, 30, 32, 58, 130, 144, 179, 180, 183–88, 202),[15] they identify by name four of the individual defendants (all but Sander and Williamson). Having considered the pertinent paragraphs in which Decherd, Moroney, Shire, and Peckham are named, the court concludes that plaintiffs have failed to plead a strong inference of scienter based on *"The Morning News* game."[16]

### VI

### A

Plaintiffs contend that they have adequately pleaded a strong inference of scienter based on allegations that defendants knew of the artificially inflated circulation at DMN no later than January 10, 2003. They argue that receipt of a January 10, 2003 letter from a distributor, and their efforts to conceal DMN's inflated circulation, show that Decherd, Moroney, and Peckham had direct knowledge of DMN's circulation overstatement, that they knew the severity of the overstatement, and that advertisers would demand the return of advertising fees that were based on inflated circulation figures. They rely on assertions that, during a January 2003 audit of DMN's circulation, a distributor who refused to lie about his true circulation numbers and was told that failure to meet circulation goals would result in a review of his contract spoke with Decherd, Moroney, and Peckham and wrote a letter to Decherd on January 10, 2003, informing them that he was being pressured to lie on his 2003 audit by reporting fraudulently inflated circulation figures, and that he possessed numerous audiotapes of conversations with his supe-

---

**15.** The court has not included any paragraphs that plaintiffs cite in a footnote but not in the text.

**16.** Although plaintiffs include other paragraphs, including ¶¶ 32 and 58, among their

citations to the complaint, *see* Ps. Br. 30–31, they rely on them for assertions that do not require additional discussion under the rubric of the *"The Morning News* game" because their inadequacy for the purposes cited is already addressed in the court's opinion.

riors telling him to lie on the audit. He also sent Decherd a copy of the audiotapes. Plaintiffs allege that Decherd asked Belo's Assistant General Counsel, David S. Starr, Esquire ("Starr"), to respond to the distributor's letter, that Starr responded that Belo was investigating the claim, and that the distributor described in detail how Peckham and other high-level executives repeatedly begged him to turn over the audiotapes. They maintain that the distributor refused the requests of Peckham and the executives to turn over the original tapes, and that he did not lie on the January 2003 audit, so defendants took away his distribution contract in December 2004. Plaintiffs contend that, in February 2003, defendants fired all the State Zone and Regional Managers who could not force their distributors to play "The Morning News game." They posit that the letters and conversations with Decherd, Moroney, and Peckham are precise and detailed facts that show their knowledge of artificially inflated circulation numbers at DMN and direct knowledge that Belo's revenue and earnings were inflated.

Responding to defendants' motions to dismiss, plaintiffs argue that defendants cannot portray their response to the distributor's complaints as an example of good management. Instead, they maintain that defendants fired all the State Zone and Regional Managers who could not force their distributors to play "The Morning News game." They argue that the so-called investigation was either a blunder or sham because, only 18 months later, defendants revealed that DMN's circulation had been overstated for at least a year, and for the very same reasons the distributor cited in January 2003. They also argue that in the first quarter of 2004, at the mid-point of the 18–month period, defendants decided to stop paying circulation bonuses and then lied about why DMN circulation had declined, citing an accounting methodology change as the reason why there would be a slight decline in circulation. Plaintiffs assert that the only reasonable inference is that defendants' so-called investigation revealed that target bonuses caused circulation inflation and needed to be discontinued, which alone is sufficient to create a strong inference of scienter.

B

As before, see supra § V(B)(1), the court disregards the allegations of plaintiffs' complaint that do not identify a specific defendant, and it assesses the adequacy of plaintiffs' scienter allegations on the basis of those that name at least one specific defendant.

In ¶ 32 plaintiffs allege that a State Zone Manager and a State Regional Manager told a distributor that he had no choice but to participate in a bogus January 2003 audit because upper management had set the circulation figures to be reported. The distributor, who understood that refusing to lie on the audit could cost him his job, began writing letters and making telephone calls to the top executives in charge, including Decherd, Moroney, and Peckham, to express concern and complain about the pressure he was under to lie on the audit by reporting fraudulently overstated circulation numbers. The distributor sent a January 10, 2003 letter to Decherd, telling him that he had been a DMN distributor for 15 years and had been told by his supervisors to lie about the amount of papers he had sold. He also informed Decherd that he had a dozen audiotapes that he had made of conversations instructing him to lie on the audit, and he sent a copy of an audiotape he had made the prior week. This tape contained recordings of the voice mail messages and conversations with his State Regional Manager and State Zone Manager telling him to lie about his circulation figures.

Plaintiffs aver in ¶ 33 that, in response to his letter, the distributor received a

January 16, 2003 letter from Starr, Belo's Assistant General Counsel, writing on behalf of Decherd. Starr stated that Belo was investigating the issues he had raised, and he requested copies of all other tapes that the distributor had referred to in his letter.

In ¶ 34 plaintiffs assert that, during the next few weeks, the distributor was contacted repeatedly by Starr, Peckham, Jeff Beckley ("Beckley"), Vice President of Circulation, and Rocky Swartz ("Swartz"), Circulation Director of Operations, each of whom begged him to turn over the tape recordings of voice mails and conversations containing damning evidence that distributors were being told to lie on the audit and demonstrating how the newspaper was backing into the circulation figures reported on the audit. They assert that the sum and substance of each telephone conversation and meeting with Starr, Peckham, Beckley, and Swartz was the same: the distributor said he refused to lie on the audit and that he did not want to lose his contract, and the executives said they were deeply concerned about getting all the tapes from the distributor and that he would be allowed to keep his contract as long as he wanted it. Plaintiffs allege that the executives were in a frenzy to obtain and permanently destroy this damning evidence that threatened to expose their whole scheme. In the end, the distributor did not lie on the January 2003 audit, but in December 2004 the executives took away his contracts to deliver the DMN.

### C

The court accepts the facts alleged in ¶¶ 32–34 regarding Decherd, Moroney, and Peckham as true and construes them in the light most favorable to plaintiffs, although it neither strains to find favorable inferences nor accepts conclusory allegations, unwarranted deductions, or legal conclusions as being true. Moreover, inferences of scienter do not survive if they are merely reasonable; they must be both reasonable and strong inferences.

### 1

Even if the court assumes *arguendo* that these allegations are sufficient to plead that Moroney and/or Peckham knew of a scheme to inflate circulation figures, the assertions are irrelevant as to either defendant individually or to Belo as a corporate defendant. As the court has held above, *see supra* § III, these defendants cannot be held liable individually because they have not been sufficiently connected to an oral or written misrepresentation or omission. Nor can Belo be held liable based on their conduct, because the absence of a basis to connect them to a misrepresentation or omission precludes a showing that Belo acted with scienter.

### 2

■■■ The court now considers the allegations against Decherd. To establish scienter based on conscious misbehavior, plaintiffs must plead strong circumstantial evidence. *Mortensen*, 123 F.Supp.2d at 1025. A strong inference of scienter requires the pleading of "particular[ ] facts that, assumed to be true, constitute persuasive, effective, and cogent evidence from which it can logically be deduced that defendant[ ] acted with intent to deceive, manipulate, or defraud." *Coates III*, 100 F.Supp.2d at 422 (emphasis omitted).[17]

17. This formulation is not inconsistent with the test for pleading a strong inference of scienter based on severe recklessness. If a plaintiff satisfies the elements of pleading scienter based on severe recklessness, he has perforce alleged facts that constitute persuasive, effective, and cogent evidence from which it can logically be deduced that the defendant acted with intent to deceive, manipulate, or defraud.

Plaintiffs complain that in SEC filings, press releases, conference calls, industry conference presentations, and analyst reports dated as early as May 12, 2003 and as late as July 23, 2004, Decherd made false statements about DMN's circulation (and, in turn, its revenue and earnings) because he knew the circulation figures were inflated.[18] By relying on the distributor communications with Decherd during the January 2003 audit, they are necessarily asserting that Decherd knew based on information provided by one distributor, concerning one audit, that DMN's circulation numbers were being falsified on a wide-ranging scale.

Viewed favorably to plaintiffs, the allegations concerning the January 2003 audit show that a single distributor expressed serious concern to Decherd, orally and in writing, because he was being pressured by his supervisors to lie during the January 2003 audit by reporting fraudulently overstated circulation numbers. The distributor had proof of his allegations in the form of audiotapes of conversations in which he was instructed to lie, and he provided Decherd a copy of one. This tape contained recordings that substantiated his accusations. Decherd thus knew in January 2003 that one distributor had been pressured to lie during the January 2003 audit.

■ But plaintiffs also aver that the distributor did *not* lie during the audit. Moreover, he received within six days of his letter a written response from Starr, Belo's Assistant General Counsel, purporting to write on behalf of Decherd. Starr stated that Belo was investigating the is-sues raised in the distributor's letter, and he requested copies of all other tapes that the distributor had referred to in his letter. Although plaintiffs allege that lower-level executives were "in a frenzy to get a hold of and permanently destroy this damning evidence that threatened to expose their whole scheme," Compl. ¶ 34, no similar assertion is made about Decherd. There is no allegation that Decherd himself pressured the distributor, that lower-level executives or managers were acting at Decherd's behest when they communicated with the distributor, or that Decherd concocted the particular plan that the distributor should lie during this audit.[19] There is no assertion that Decherd did anything except listen to the distributor's accusations and, within a matter of days, direct Belo's Assistant General Counsel to investigate them. Nor do plaintiffs aver that the distributor informed Decherd, or that Decherd knew, that the circulation problem was systemic or widespread. In sum, viewed favorably to plaintiffs, Decherd knew in January 2003 that a single distributor had been pressured by the State Zone Manager and the State Regional Manager to lie during the January 2003 audit and that the distributor did not in fact lie, and Decherd caused Belo's Assistant General Counsel to investigate the accusations. These allegations do not plead a strong inference that Decherd acted with scienter, and they are therefore insufficient. *See R2 Invs.*, 401 F.3d at 645 (holding that inferences of scienter survive motion to dismiss only if both reasonable and strong).

18. The complaint does not allege that Decherd's failure to disclose the existence of the distributor's complaint constituted a material omission of fact, in violation of § 10(b) of the Exchange Act or Rule 10b–5.

19. The allegations concerning planning the scheme are directed primarily to "defendants" as a group. *See, e.g.,* Compl. ¶ 2 ("Beginning as early as 1999, defendants initiated and engaged in a scheme to defraud advertisers at The Dallas Morning News as well as Belo's investors.").

VII

A

Plaintiffs next argue that they have pleaded scienter based on numerous, repeated, and significant violations of GAAP, combined with other evidence that defendants knew or were reckless in not knowing of the accounting violations. They maintain that Belo violated GAAP by accounting for revenue based on unearned DMN revenue attributable to inflated circulation-related overcharges, failing to disclose known risks and uncertainties related to DMN's artificially inflated circulation, failing to reserve costs to repay advertisers who had been fraudulently overcharged based on inflated circulation figures, failing to restate Belo's public financial statements, ignoring inadequate accounting controls, and numerous other GAAP principles.

Plaintiffs contend that as Belo's top executives, each defendant controlled Belo's accounting policies, internal controls, and financial reporting and possessed special knowledge about accounting practices and controls. They posit that defendants used their knowledge to develop and implement a complex scheme designed to artificially inflate circulation at DMN and that they allowed the results—artificially inflated revenue and circulation numbers—to be reported in numerous SEC filings. They also rely, as before, on the January 2003 disclosures that the distributor made to Decherd, Peckham, and others that he had been instructed to lie about his circulation, arguing that, despite this knowledge, defendants continued to issue Belo quarterly and year-end financial reports that violated GAAP and contained false financial results during the class period. Plaintiffs argue that the repeated GAAP violations, considered together with allegations that defendants created the scheme or knew no later than January 2003 that DMN's circulation was artificially inflated, and with all of their other allegations, are sufficient to support a strong inference of scienter.

B

■ Beginning at least with *Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir.1990), and most recently in *Barrie v. Intervoice–Brite, Inc.*, 397 F.3d 249, 264, *modified and reh'g denied*, 409 F.3d 653 (5th Cir.2005), Fifth Circuit cases teach that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." *Fine*, 919 F.2d at 297. Plaintiffs implicitly recognize this principle because they argue that their allegations of GAAP violations, combined with other evidence that defendants knew or were reckless in not knowing of the accounting violations, are adequate to plead a strong inference of scienter.

The fallacy with plaintiffs' reliance on GAAP violations, however, is that their allegations concerning defendants' knowledge of, or severe recklessness in, publishing materially false information are not materially stronger in this context than they are in those addressed above. In other words, because plaintiffs have failed, for the reasons already explained, to connect a particular defendant to an oral or written misrepresentation or omission or to plead a strong inference of scienter with respect to any other particular defendant, they cannot simply add allegations of GAAP violations to the mix and argue that they have now pleaded a strong inference of scienter. They are effectively left only with assertions of failures to follow GAAP.

Accordingly, the court holds that plaintiffs have failed to plead a strong inference of scienter on this basis.

## VIII

### A

Plaintiffs next maintain that they have pleaded a strong inference of scienter based on defendants' post-class period admissions and disclosures that identify their false class period statements. Citing a conclusion in *Plotkin* that "allegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation," *Plotkin*, 407 F.3d at 698, they posit that defendants admitted that their class period circulation overstatements were false and misleading.

Plaintiffs point to the following allegations in their complaint. First, "[i]n [an August 5, 2004] press release, Belo admitted that it had already advised the [Audit Bureau of Circulation ("ABC")] of its intention to restate previously reported inflated circulation figures for The Dallas Morning News for the six month periods ended September 2003 and March 2004." Compl. ¶ 127. Second, on that same day, Decherd stated that DMN "is making procedural changes necessary to ensure the collection and reporting of more accurate circulation data." *Id.* at ¶ 133. Third, on February 3, 2005 Belo admitted that, on January 21, 2005, ABC had

> advised [Belo] that it will not be issuing an audit report of [DMN's] circulation figures for the twelve months ended March 31, 2004 or the six months ended September 30, 2004, as it had originally planned ... primarily because the reliable documents and records needed to support revised circulation figures for only single copy sales do not exist.

*Id.* at ¶ 147.[20] Fourth, on August 6, 2004 the Fort Worth *Star–Telegram* published an article that reported that "a bonus program [at DMN] aimed at boosting sales provided an incentive to understate re-

turned papers," and that "[t]he program was discontinued this spring, Belo said." *Id.* at ¶ 134.

Concerning the fourth allegation, plaintiffs maintain that defendants continued this practice in the first quarter of 2004 and that they certainly should have known, or were reckless in not knowing sometime shortly after January 10, 2003, that the bonus program provided an incentive to understate returned newspapers. They also argue that defendants knew about this much earlier, in early 2000, when they developed the scheme to artificially inflate Belo's earnings through manipulations at DMN. Plaintiffs cite a Belo press release that stated that the "circulation sales rewards programs" initiated in 1999 "resulted in an overstatement of circulation that grew over time." Compl. ¶ 129. They argue that the circulation sales rewards plan that caused a circulation overstatement, coupled with the information the distributor provided in January 2003 and defendants' decision to discontinue the plan in the first quarter of 2004, creates a strong inference that defendants either knew, or were reckless in not discovering, the artificially inflated circulation at DMN. They say that this raises the question at the center of their complaint: What did defendants do during the 18–month period between January 2003 and the revelation of the circulation overstatement that caused them to discontinue the rewards plan in the first quarter of 2004? Plaintiffs answer the question by arguing that the only reasonable inference from the facts alleged and from Decherd's post-class period statements is that defendants discovered during this period that the bonuses were artificially inflating DMN's circulation, and they hid it from the market until August 5, 2004. They maintain that they have at least pleaded that defendants

---

**20.** ABC is "a non-profit, private entity charged with monitoring the accuracy of cir- culation numbers for 440 publications nation- wide." Compl. ¶ 40.

were severely reckless [21] in failing to discover the scheme to artificially inflate DMN's circulation during the 18–month period, and that defendants' post-class period attempts to explain away the circulation inflation at DMN are evidence of their scienter.

## B

In *Plotkin* the panel addressed whether the plaintiffs had pleaded facts that permitted the inference that a corporate defendant's customers—whose sizable purchase orders were touted in the company's press releases—lacked the business potential to pay for the orders. The district court had held that they had not. *See Plotkin*, 407 F.3d at 692–96. Relying on factual developments concerning the customers that transpired after the company issued the press releases, the court held that the allegations were "so temporally connected that they shed light on the financial condition of the [customers] at the time of the announcements and bolstered [plaintiffs'] suspicion that, at the time [the customers] entered into the contracts with [the company], [the customers] could not perform their obligations." *Id.* at 698. It recognized that a "'[p]laintiff cannot

charge Defendants with intentionally misleading their investors about facts Defendants may have become aware of after making allegedly misleading statements to the public.'" *Id.* (quoting *Lain v. Evans*, 123 F.Supp.2d 344, 350 (N.D.Tex.2000) (Sanders, J.)). But it held that "allegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation." *Id.*

■ Plaintiffs' reliance on this principle derived from *Plotkin* is misplaced for at least two reasons. First, plaintiffs are attempting to stretch the precept beyond its intended function. *Plotkin* would support the inference that the disclosures Belo made on August 5, 2004 are indicative of the existence of overcirculation problems at DMN at an earlier time, including at the time at least some of the SEC filings and other disclosures at issue were being made. What it would not do of itself, however, is support a strong inference of scienter on the part of a specific defendant, that is, that the defendant acted intentionally or with severe recklessness in making misrepresentations or omissions about DMN's circulation, Belo's revenue or earnings, or other facts on which plaintiffs rely.[22]

---

**21.** The court has found indications in the complaint that plaintiffs allege that defendants were reckless. *See supra* note 13. They do not plead, however, that a specific defendant was severely reckless. Not only does this term (or a close variation) not appear in the complaint, but, more important, the concept cannot be found. There is no attempt to allege facts in support of the premise that a defendant made a highly unreasonable omission or misrepresentation that involved not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and that presented a danger of misleading buyers or sellers that was either known to the defendant or so obvious that the defendant must have been aware of it.

**22.** Moreover, *Plotkin* is distinguishable on another basis. In *Plotkin* the plaintiffs alleged

that one defendant was a struggling company that announced that it had reached agreements that would bring multimillion dollar revenues, amounting to a thirty-fold increase over those generated in a prior year. *See Plotkin*, 407 F.3d at 700. Given the importance of these deals, it was reasonable to assume that the company would have familiarized itself with the financial condition of the two entities making the purchases and would have discovered details about their poor financial condition. *Id.* The Fifth Circuit held that the plaintiffs had thus alleged specific facts that gave rise to a strong inference that the company knew or was severely reckless in not knowing that the purchasers were not able or were not likely to be able to make the contracted payments. *Id.*

By contrast, plaintiffs in this case do not allege specific facts concerning the magnitude

Second, plaintiffs cannot rely on *Plotkin* to shore up other fundamental deficiencies in their complaint. For example, they cannot fail to identify individual defendants by name, distinguish among those whom they sue, and enlighten each defendant as to that person's particular part in the alleged fraud, and then purport to cure this defect by relying on so-called post-class period admissions and disclosures. The *Plotkin* principle permits the inference that facts that first come to light after an allegedly fraudulent act was committed may be probative of what was actually true (and was perhaps known or should have been known) beforehand. It is not a substitute for the defendant-specific allegations that the PSLRA requires.

Accordingly, the court concludes that plaintiffs have not pleaded a strong inference of scienter on this basis.

## IX

### A

Finally, plaintiffs rely on allegations of management bonuses and Decherd's insider trading to support a strong inference of scienter.

Plaintiffs allege that defendants motivated managers at lower levels than they "to participate in the scheme to overstate circulation by paying incentive bonuses for meeting circulation 'goals.'" Ps. Br. 41 (citing Compl. ¶ 8). They rely on state circulation meetings conducted for the purpose of creating strategic objectives to mo-

tivate DMN distributors with "such things as a benefits package that included insurance, retirement and disability." *Id.* at 42 (citing Compl. ¶ 9). Plaintiffs maintain that the incentive programs allowed defendants to increase their charges to advertisers, which, in turn, increased Belo's revenues and profits.

Regarding insider trading, plaintiffs point to three stock sales that Decherd made during the class period—40,000 shares apiece on November 3, 2003, March 1, 2004, and May 3, 2004—and argue that they were suspiciously timed. They posit that each sale occurred after Decherd received the distributor's letter stating that he had been asked to lie about his circulation and within nine months of Belo's August 5, 2004 announcement of inflated circulation figures.

Concerning the November 3, 2003 sale, they contend that, in the fall of 2003, defendants began pumping up the price of Belo's stock with positive statements that touted the turnaround of DMN newspaper circulation and advertising revenue growth. Consequently, Belo's stock price rose 22.7% between August 11, 2003 and October 28, 2003, and Decherd, knowing that DMN's reported circulation figures were inflated, sold 40,000 shares on November 3, 2003.

Regarding the March 1, 2004 sale, plaintiffs argue that defendants announced on March 9, 2004 that DMN circulation would

---

of the circulation overstatements that would permit the strong inference that Belo knew or was severely reckless in not knowing that circulation was being artificially inflated. As compared with the defendant company in *Plotkin*, who was expected to be familiar with two customers whose purchases created a thirty-fold increase in revenue, plaintiffs do not allege contextual facts that, viewed favorably, show that overstatements in daily circulation of 1.5% daily or 5% on Sunday produced a similar expectation that Belo would

be familiar with the circulation counting practices and resulting counts, and, in turn, that it knew or was severely reckless in not knowing that the numbers were inflated. *See also Coates v. Heartland Wireless Commnc'ns, Inc.*, 55 F.Supp.2d 628, 639 (N.D.Tex.1999) (Fitzwater, J.) (holding plaintiffs failed adequately to plead strong inference of scienter where, *inter alia*, they failed to provide specific, contextual financial information allowing inference that alleged overstated receivables were material).

be down slightly due to a change in calculation methodology. Belo stock dropped as a result to a low of $26.09 per share on March 16, 2004. They allege that Decherd used his inside information to avoid this decline by selling 40,000 shares at $27.72 per share, for a total of approximately $1.1 million. Plaintiffs also assert that the timing of the sale was also highly suspicious because Belo had just decided to suspend the practice of paying managers bonuses to achieve circulation targets.

As to the May 3, 2004 sale, plaintiffs argue that the transaction was suspiciously timed because it was slightly over 1½ months before Belo issued a June 22, 2004 earnings warning for the second quarter of 2004. This caused Belo stock to fall 16.7% to $22.69 per share by June 25, 2004. The sale also occurred less than one month before Decherd ordered Belo executives to conduct a review of circulation practices at DMN, which plaintiffs assert he knew would result in exposure of defendants' scheme to artificially inflate DMN's circulation numbers.

### B

 Allegations of incentives and bonuses can be part of a larger body of averments that are sufficient to plead a strong inference of scienter. They are actually a motive and opportunity-type of allegation, which is recognized in this circuit as an assertion that can meaningfully enhance the strength of the inference of scienter. *See Barrie,* 397 F.3d at 264 ("Moreover, the allegations of knowledge and severe recklessness must be considered in conjunction with the defendants' bonuses and stock sales profits.").

 It is important to understand, however, the nature of the management incentives and bonuses on which plaintiffs rely. They do not allege incentives or bonuses *that a defendant qualified for or received.* Instead, they refer to benefits extended to lower-level managers and independent distributors. That is, plaintiffs confuse incentives and bonuses offered to employees or distributors with those for which a defendant would have been eligible. The cases that plaintiffs cite—*Barrie* and *Abrams*—pertain to how a *defendant's* compensation can be probative of scienter. *See id.; Abrams,* 292 F.3d at 431. Accordingly, plaintiffs have failed to plead a strong inference of scienter on this basis.

### C

 Plaintiffs allege that Decherd sold Belo stock three times (totaling $3 million) at artificially inflated prices in order to profit from the fraud, and that he did so with knowledge of material, non-public information. "'Insider' trading must be 'unusual' to have meaningful probative value." *Nathenson,* 267 F.3d at 420–21 (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995)). "Only insider trading in suspicious amounts or at suspicious times is probative of scienter." *Abrams,* 292 F.3d at 435. Plaintiffs' complaint is inadequate to plead a strong inference of scienter based on Decherd's sales.

First, plaintiffs rely on allegations concerning Decherd's stock sales to plead a strong inference of scienter as to *all defendants.* Yet they do not allege that any other defendant sold shares during the class period. "The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." *Southland,* 365 F.3d at 369 (citing *Acito,* 47 F.3d at 54); *Nathenson,* 267 F.3d at 421 (same). "[E]ven unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class

Period." *Abrams,* 292 F.3d at 435. "[A]n insider's 'sales do not support the "strong inference" required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made.'" *In re Enron Corp. Sec., Derivative & "ERISA Litig."*, 258 F.Supp.2d 576, 594 (S.D.Tex.2003)(quoting *Ronconi v. Larkin,* 253 F.3d 423, 436 (9th Cir.2001)).

Second, the allegations are insufficient to plead a strong inference of scienter as to Decherd. Because insider stock sales must be unusual and involve trading in suspicious amounts or at suspicious times to be probative of scienter, courts require plaintiffs to allege specific contextual facts that support the inference that the sales are in fact unusual or suspicious. "Context is critical to the analysis." *Id.* The "mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough[.]" *Id.* (quoting *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198 (1st Cir. 1999)).

██ "Insider stock sales are suspicious 'when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."'" *Id.* at 593 (quoting *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 937 (9th Cir.2003)).

Whether there is an unusual or suspicious pattern of insider trading may be gauged by such factors as timing of the sales (how close to the class period's high price), the amount and percentage of the seller's holdings sold, the amount of profit the insider received, the number of other insiders selling, or a substantial change in the volume of insider sales.

*Id.* at 593–94.

In this case, however, "[p]laintiffs make no allegations that [Decherd's] sales are out of line with prior trading practices." *Abrams,* 292 F.3d at 435. They do not specify whether Decherd sold shares before or after the class period and, if so, in what quantities and for what price. For example, if Decherd periodically sold 40,000 shares of stock on roughly the schedule followed for the three sales that plaintiffs cite, the complaint would be inadequate to plead that the sales were in suspicious amounts or at suspicious times.

Nor do plaintiffs specify the portion of Decherd's stock that he sold.[23] Because Decherd is the only defendant who is alleged to have sold stock, this omission can be significant. *See In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d 283, 296 (S.D.N.Y.1999) ("In *Acito,* only one corporate insider sold his personal stock, and he only sold 11% of his holdings during the Class Period." (citing *Acito,* 47 F.3d at 54)).

Finally, the complaint does not address whether the sales took place under the terms of an established Rule 10b–5(1) plan. The parties vigorously dispute in the briefing whether Decherd's sales were made under Rule 10b–5(1) according to a trading plan adopted in November 2001, i.e., be-

---

**23.** In their reply brief, defendants contend that Decherd owned over one million shares of Belo Series A common stock and seven million shares of Belo Series B common stock, suggesting that sales of 120,000 total shares during the class period amount to a small percentage (less than 2%) of his hold-
ings. The court need not credit this assertion to find that plaintiffs' complaint is insufficient to plead a strong inference of scienter. The relevant question is whether plaintiffs have specified the portion of Decherd's shares that he sold.

fore the events beginning in January 2003 that plaintiffs contend confirm the suspicious nature of the sales. Plaintiffs' answer to defendants' reliance on this plan is that defendants developed their scheme to defraud in 2000, well before Decherd created the plan. They maintain that Decherd knew the scheme would cause Belo's share price to increase artificially, and he adopted the plan in an attempt to implicate Rule 10b–5 and the safe harbor and capitalize on the inflated share price.

For present purposes, the court need not resolve this dispute. What matters at this stage of the case is whether plaintiffs have placed Decherd's trading in context by addressing in their complaint whether Decherd sold his stock pursuant to a Rule 10b–5(1) trading plan formulated before the alleged fraudulent scheme and why, if he did, this does not undercut a strong inference of scienter. *See In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *8 (N.D.Cal. June 28, 2005) (rejecting plaintiffs' contention that "defendants' stock sales [provide] a basis for showing that defendants deliberately misled investors" where, *inter alia,* defendants' "sales were pursuant to a Rule 10b–5(1) trading plan"). Because they have not, this defect also undermines their attempt to plead a strong inference of scienter based on Decherd's stock sales.

Accordingly, the court holds that plaintiffs have failed to plead a strong inference of scienter on this basis.

## X

Having addressed each of plaintiffs' arguments, the court must now assess the complaint *in toto.* It is obligated to consider all the facts and circumstances alleged to determine whether they raise the requisite strong inference of scienter. The court must consider cumulatively any evidence of scienter that plaintiffs have pleaded. At all times, of course, it focuses on whether the inferences of scienter are both reasonable and strong inferences.

■ It is important to recall from the outset of this analysis that plaintiffs' complaint suffers throughout from the shortcoming of a type of group pleading when attempting to allege scienter. When the court evaluates the complaint in its entirety, it does not treat allegations that are *not* defendant-specific as if they *did* enlighten each defendant as to that person's particular part in the alleged fraud. *See Goldstein,* 340 F.3d at 249 (holding that plaintiffs must particularize intent allegations raising strong inference of scienter); *see also Southland,* 365 F.3d at 365 (addressing group pleading doctrine and holding that plaintiffs must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud"). Nor does the court credit conclusory allegations about scienter. *See Fin. Acquisition Partners,* 440 F.3d at 286 ("On the other hand, as noted, the plaintiff must plead specific facts, *not conclusory allegations,* to avoid dismissal."). Nor does it credit unwarranted deductions. *See Southland,* 365 F.3d at 361. Thus allegations such as that "defendants knew" or that "defendants were well aware" that circulation numbers and/or revenues were overstated, or that this information was being concealed from investors, or that Belo lacked adequate internal controls capable of reporting accurate circulation data for DMN[24] are insufficient to defeat dismissal. A plaintiff may not "rely on rote allegations that a defendant 'knowingly' did something." *Coates v. Heartland Wireless Commnc'ns, Inc.,* 55 F.Supp.2d 126.

---

**24.** *See* Compl. ¶¶ 39, 55, 58, 62, 65, 69, 74, 80, 84, 91, 94, 96, 98, 106, 109, 113, 123, and

628, 635 (N.D.Tex.1999) (*"Coates II"*) (citing *Melder v. Morris,* 27 F.3d 1097, 1104 (5th Cir.1994)).

The more specific allegations that arguably relate to the individual defendants' conscious misbehavior do not support a strong inference that defendants acted with scienter. These averments, viewed favorably, establish at most that Moroney and Decherd engaged in acceptable management techniques intended to increase DMN circulation and corporate revenues by emphasizing personal employee responsibility and increasing employee awareness of the adverse consequences of failure. The complaint shows that Decherd knew in January 2003 that a single distributor had been pressured by the State Zone Manager and the State Regional Manager to lie during the January 2003 audit, but the distributor did not in fact lie, and Decherd responded to the accusation by causing Belo's Assistant General Counsel to investigate it. Belo issued quarterly and year-end financial reports that violated GAAP and contained false financial results during the class period. In August 2004 Belo admitted that it had advised ABC of its intention to restate previously reported inflated circulation figures for DMN for the six-month periods ended September 2003 and March 2004, and it revealed that it was making procedural changes to ensure the collection and reporting of more accurate circulation data. Also in August 2004 the Fort Worth *Star–Telegram* reported that a DMN bonus program aimed at boosting sales provided an incentive to understate returned papers, and that the program had been discontinued in the spring. In February 2005 Belo admitted that in January 2005 ABC had advised Belo that it would not issue an audit report of DMN's circulation figures for the twelve months ended March 31, 2004 or the six months ended September 30, 2004, primarily because the reliable documents and records needed to support revised circulation figures for only single copy sales did not exist. Managers were paid incentive bonuses for meeting circulation goals and were provided benefits packages that included insurance, retirement, and disability. And Decherd made three sales of stock during the class period—40,000 shares apiece on November 3, 2003, March 1, 2004, and May 3, 2004—totaling more than $3 million in proceeds.

■ Viewing the allegations of scienter as a whole, the court concludes that the complaint is legally inadequate to plead a strong inference—as opposed to a reasonable inference—of scienter. When the group pleading averments, conclusory allegations, and unwarranted deductions contained in plaintiffs' complaint are placed to one side, it is apparent that plaintiffs at most allege that Belo adopted programs that included practices, such as financial incentives and rewards and accountability methods, that were intended to motivate managers, distributors, and subscription solicitors to sell newspapers and to increase DMN's circulation. These practices were subject to abuse and were in fact abused by certain managers and independent contractors, who had positive or negative incentives to falsify the circulation numbers. Eventually, the problems generated by these practices and methods came to light, and Belo disclosed them and took corrective measures. Plaintiffs have neither sufficiently pleaded that any defendant created a scheme, nor have they adequately connected knowledge of abuse of the system (i.e., actual awareness of artificially inflated circulation figures) to an individual defendant or to someone else whose knowledge is attributable to Belo, so as to plead a strong inference of scienter based on conscious misbehavior. Even if more competent management could have anticipated that Belo's practices and methods would create a risk or even a probabili-

ty of abuse, mismanagement alone is not enough to constitute securities fraud. *See, e.g., Coates II,* 55 F.Supp.2d at 636 (citing *Acito,* 47 F.3d at 53).

Because plaintiffs have failed to allege scienter as to any individual defendant or as to any other corporate official who made or issued statements, or ordered or approved them or their making or issuance, or who furnished information or language for inclusion therein, or the like, they have not adequately pleaded a strong inference that Belo acted with scienter. *See Southland,* 365 F.3d at 366–67.

### XI

Plaintiffs also seek to hold the individual defendants liable as control persons under § 20(a) of the Exchange Act. "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland,* 365 F.3d at 383 (citing *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1021 n. 8 (5th Cir.1996)). Because plaintiffs have failed to plead a primary violation under 10(b) of the Exchange Act and Rule 10b–5, the court also dismisses their § 20(a) claim.

### XII

Having concluded that plaintiffs have failed to plead a strong inference of scienter as required by the PSLRA, the court must decide whether to allow them to replead. This court's approach in cases decided under the PSLRA has been to allow plaintiffs at least one opportunity to replead after the court has filed an opinion identifying defects in a complaint.

Although § 78u–4(b)(3)(A) of the PSLRA states that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the require-

ments of paragraphs (1) and (2) are not met," there is nothing in this language that indicates that district courts are required to dismiss securities fraud claims without first granting leave to amend.... Because a more carefully drafted complaint might state a claim upon which relief may be granted, the court grants plaintiffs an opportunity to amend their complaint.

*Coates I,* 26 F.Supp.2d at 923. The court will adhere to this procedure in the present case and allow plaintiffs to replead.[25]

\* \* \*

Defendants' motions to dismiss are granted. Plaintiffs shall have 30 days from the date this memorandum opinion and order is filed to file an amended complaint that complies with the PSLRA and Rule 9(b).

**SO ORDERED.**

---

**25.** The court expresses no view concerning defendants' contention that the misstatements and omissions on which plaintiffs rely are insufficient to plead fraud with the requisite pleading specificity.